# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| PURPLE RABBIT MUSIC, et al., | ) |
| Plaintiff, | ) |
| v. | ) NO. 3:18-cv-00520 |
| JCJ PRODUCTIONS, L.L.C., JACOB TUCKER, and BRANDON TUCKER, | ) JUDGE CAMPBELL<br>) MAGISTRATE JUDGE<br>) HOLMES |
| Defendants. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Purple Rabbit Music, U Rule Music, Divine Pimp Publishing, Key Club Music, and Lellow Productions, Inc., filed this suit against Defendants JCJ Productions, LLC, Jacob Tucker and Brandon Tucker, on June 5, 2018. (Doc. 1). The Court granted default judgment on September 9, 2019. (Doc. 45). Plaintiffs filed an application for monetary judgment on November 8, 2019. (Doc. 50). A hearing on Plaintiffs' application was held on November 15, 2019, and none of the Defendants, nor anyone on their behalf, appeared at the hearing. (Doc. 51).

For the reasons discussed below, Plaintiffs' Application for Monetary Judgment (Doc. No. 50) is **GRANTED**.

### I. FINDINGS OF FACT

1. The Plaintiffs are the owners of the copyrights in the musical works set forth in Schedule A (the "Musical Works") of the Amended Complaint. (Am. Compl., Doc. 17, ¶ 4 & Schedule A, Doc. 17-1).

2. Defendant JCJ Productions, LLC ("JCJP") is a limited liability company organized under the laws of Tennessee, with a principal place of business located at 1530 Demonbreun Street, Nashville, Tennessee 37203. (Doc. 17, ¶ 5).

3. All times relevant to this lawsuit, JCJP owned, controlled, managed, operated, and/or maintained a place of business for public entertainment, accommodation, amusement, and refreshment known as Frisky Frogs located at 1530 Demonbreun Street, Nashville, Tennessee 37203. (*Id.*, ¶ 6).

4. Musical compositions were publicly performed at Frisky Frogs. (Id., ¶ 7).

5. At all times relevant to this lawsuit, Defendants Jacob Tucker and Brandon Tucker were members and/or principals of JCJP. (Id., ¶ 10).

6. At all times relevant to this lawsuit, Defendants Jacob Tucker and Brandon Tucker were responsible for the control, management, operation, and maintenance of the affairs of JCJP. (*Id.*, ¶ 11).

7. Until its ultimate closure, and at all times relevant to this litigation, Defendants jointly owned and operated Frisky Frogs. (*see* Defs.' Resp. Req. Admis., Doc. 27-5, ¶ 6).

8. Until its ultimate closure, and at all times relevant to this litigation, Defendant Jacob Tucker, as specifically admitted to by Defendants in response to requests for admission, had the right and ability to supervise and control the public performance of musical compositions and to determine the music policy at Frisky Frogs. (*Id.*, ¶ 23; *see also* Doc. 17, ¶ 12).

9. Until its ultimate closure, and at all times relevant to this litigation, Defendant Brandon Tucker, as specifically admitted to by Defendants in response to requests for admission, had the right and ability to supervise and control the public performance of musical compositions and to determine the music policy at Frisky Frogs. (Doc. 27-5, ¶ 24; *see also* Doc. 17, ¶ 12).

10. Each Defendant derived a direct financial benefit from the public performance of musical compositions at Frisky Frogs. (*Id.*, ¶ 13).

11. The Plaintiffs are all members of the American Society of Composers, Authors,

17

and Publishers ("ASCAP"), a membership association that represents, licenses, and protects the public performance rights of its members. (Decl. of John Johnson, Doc. 50-2, ¶ 4).

12. Each ASCAP member grants to ASCAP a non-exclusive right to license the right of public performance in that member's copyrighted musical compositions. (Doc. 17, ¶ 15).

13. On behalf of all of its members, ASCAP licenses the right to perform publicly all of the millions of copyrighted songs in the ASCAP repertory, which includes the Musical Works, collects license fees associated with those performances, and distributes royalties to its members, less ASCAP's operating expenses. (Doc. 50-2, ¶ 5).

14. ASCAP licensing representatives attempt to license all restaurants, bars, nightclubs, and similar such establishments pursuant to ASCAP's form "General License Agreement – Restaurants, Bars, Nightclubs, and Similar Establishments" (the "Form License Agreement"). (*Id*., ¶ 10; Ex. 2[1]).

15. A form "Rate Schedule and Statement of Operating Policy" (the "Rate Schedule")[2] is annexed to, and incorporated by reference into, the Form License Agreement. (*Id.*).

16. The Rate Schedule is updated on an annual basis to account for increases in the Consumer Price Index, All Urban Consumers, and sets forth the various factors upon which annual license fees for each licensed establishment are calculated. (*Id*., ¶ 11).

17. The Form License Agreement for restaurants, nightclubs, and similar establishments is a "blanket license" authorizing the licensee to play any and/or all of the works

---

[1] The Form License Agreement is authenticated by a qualified witness pursuant to Fed. R. Evid. 901(b)(1) and is a record of regularly conducted activity pursuant to Fed. R. Evid. 803(6). (*See* Doc 50-2).

[2] The Rate Schedules for 2016, 2017, and 2018 are attached to the Declaration of John Johnson as Exhibits 3 through 5, are authenticated by a qualified witness pursuant to Fed. R. Evid. 901(b)(1) and are a record of regularly conducted activity pursuant to Fed. R. Evid. 803(6). (*See* Doc. 50-2).

in the ASCAP's repertory in consideration for payment of an annual license fee. (*Id.*, ¶ 12).

18. ASCAP's dealings with the Defendants began in December 2016. (Doc. 17, ¶ 16; see also Doc 50-2, ¶ 153).

19. Since December 2016, ASCAP licensing representatives repeatedly warned Defendants about the consequences of performing ASCAP's members' music works without proper authorization and attempted to offer an ASCAP license agreement for Frisky Frogs. (Doc. 17, ¶ 16; Doc. 50-2, ¶ 16; Doc. 27-5, ¶ 7).

20. Since December 2016, ASCAP licensing representatives have made more than eighty (80) attempts to contact the Defendants, their representatives, agents, or employees, to offer an ASCAP license for Frisky Frogs. (Doc. 50-2, ¶ 16). These attempted contacts have been made by telephone, by mail, by email, and in-person. (*Id.*).

21. At all times relevant, the license fees for Frisky Frogs quoted to the Defendants by ASCAP representatives were derived from ASCAP's uniform Rate Schedules used to compute license fees for similarly situated establishments. (*Id.*, ¶ 19 & Exs. 3, 4, 5).

22. After multiple telephone contacts, Defendant Jacob Tucker agreed to an in-person meeting with an ASCAP representative on the morning of March 6, 2017, but he failed to show up for the scheduled meeting. (*Id.,* ¶ 16 & Ex. 6).

23. Over the ensuing six (6) months after Defendant Jacob Tucker failed to appear for the scheduled meeting, eighteen (18) telephone calls were made to Frisky Frogs, which included telephone conversations with Frisky Frogs representatives including Defendant Jacob Tucker and consistently resulted in unreturned phone calls or general avoidance efforts. (*Id.*).

---

[3] Factual findings regarding ASCAP's dealings with Defendants that are set forth in the Declaration of John Johnson (Doc. 50-2) are based on information contained in a file on Frisky Frogs which was created and is maintained by ASCAP. The file is authenticated by a qualified witness pursuant to Fed. R. Evid. 901(b)(1) and is a record of regularly conducted activity pursuant to Fed. R. Evid. 803(6). (*See* Doc 50-2).

19

24. On February 3, 2018, an independent investigator was hired by ASCAP to visit Frisky Frogs to take notes regarding the musical entertainment at Frisky Frogs and the songs performed during the visit. (*Id.*, ¶ 22).

25. According to the investigator's report, the songs performed at Frisky Frogs on February 3, 2018, included the Musical Works. (*Id.*, ¶ 22 & Ex. 8[4]).

26. On February 3, 2018, there were three forms of musical entertainment performed at Frisky Frogs: a live band, piped in music, and a disc jockey. (*Id.*; *see also* Doc. 27-5, ¶¶ 13, 14).

27. On February 3, 2018, Defendants did not have an ASCAP license for Frisky Frogs. (Doc. 27-5, ¶ 11).

28. Frisky Frogs was open to the public on February 3, 2018. (*Id.*, ¶ 12).

29. Frisky Frogs is believed to have ceased operations in or around December 2018. (Doc. 50-2; Doc. 50-3, ¶ 8).

30. Despite repeated reminders of their liability under the United States Copyright Law, Defendants continued to present public performances of the copyrighted musical compositions of ASCAP members at Frisky Frogs, without permission, for the entertainment of their patrons. (Doc. 50-2, ¶ 18).

31. Based on the Rate Schedule, the prorated license fees "saved" or "avoided" by Defendants is $9,297.33. (Doc. 50-2, ¶¶ 20 through 23).

32. Plaintiffs commenced this action on June 5, 2018. (*see* Doc. 1).

33. Defendants failed to answer the Complaint by the deadline to do so, and Plaintiffs accordingly filed a motion for default on July 18, 2018. (Docs. 9-11).

34. Defendants eventually answered the Complaint on July 31, 2018. (Doc. 14).

---

[4] The investigator's report is authenticated by a qualified witness pursuant to Fed. R. Evid. 901(b)(1), and is a record of regularly conducted activity pursuant to Fed. R. Evid. 803(6). (*See* Doc. 50-2).

35. The Plaintiffs filed an Amended Complaint on August 15, 2018. (Doc. 17).

36. Defendants filed an answer to the Amended Complaint on October 5, 2018, which answer generally denied any copyright infringement. (Doc. 20).

37. Plaintiffs served Defendants with requests for admission on October 25, 2018. (Doc. 50-3, ¶ 5).

38. Defendants served responses to Plaintiffs' requests for admission on November 26, 2018. (*Id.*; *see also* Doc. 27-5).

39. In response to specific requests for admission regarding Plaintiffs' ownership of the involved copyrights and defendants' lack of permission to perform specific copyrighted material on specific dates, Defendants recited "lack of knowledge or information," indicating a "lack of knowledge" as to whether they received permission from the Plaintiffs to perform the Musical Works. (*Id.*).

40. Defendants' responses to Plaintiffs' requests for admission reflect a continuation of a deliberate course of evasive conduct on the part of the Defendants. (*Id.*).

41. Counsel for the Plaintiffs and former counsel of record for the Defendants appeared for a telephone case management conference on January 30, 2019, during which Defendants' former counsel was directed to remind his clients about the case management deadlines that were in place at that time. (*See* Doc. 23 at n.2).

42. On February 4, 2019, former counsel of record for Defendants filed a motion to withdraw. (Doc. 24). Attached to this motion is a letter to Defendants from their former counsel notifying them of his intention to withdraw and reciting his numerous unsuccessful efforts to discuss with them pending deadlines and discovery deficiencies. (Doc. 24-1). Also attached to the motion is an email from Defendant Jacob Tucker, advising Defendants' former counsel that Defendants wish to terminate his services based on their intention "to go in a different direction."

(Doc. 24-2).

43. The motion to withdraw was granted. (Doc. 25).

44. Defendants were given time to retain new counsel, and JCJ was expressly admonished that its failure to retain counsel would be grounds for default because it cannot appear *pro se*. (Doc. 25).

45. On February 14, 2019, Plaintiffs filed a motion to compel discovery and for other relief. (Doc. 27).

46. Because the time for Defendants to retain new counsel had not yet expired at that time, the Court, by order entered on February 15, 2019, allowed Defendants until March 15, 2019, to respond to Plaintiffs' motion to compel, and warned Defendants that failure to timely respond could result in sanctions, including any of those permitted by Rule 16(f) and Rule 37. (Doc. 28).

47. Defendants did not respond to Plaintiffs' motion to compel by March 15, and no attorney entered an appearance on behalf of any of the Defendants before the deadline established by the Court. (Doc. 29).

48. On March 30, 2019, the Court entered an order granting Plaintiffs' motion to compel and directed Defendants to provide full and complete responses to Plaintiffs' discovery requests no later than April 10, 2019. (Doc. 30).

49. In the March 30 order, Defendants were again warned that failure to provide discovery could result in a default judgment. (*Id.* at PageID # 135).

50. The March 30 order was returned to the Court as undeliverable to Defendants. (Docs. 31, 32, 39). However, this order was not the first time Defendants had been notified that failing to comply with the Court's orders could result in default. (*See* Docs. 25, 28).

51. The individual Defendants were expressly ordered to notify the Court if they intended to proceed *pro se.* (*See* Doc. 25). The Defendants never provided the Court with such notice, nor did they provide the Court with an up-to-date mailing address. (*See* Doc. 40 at fn. 7).

52. The Defendants never served responses to Plaintiffs' first set of interrogatories and requests for production. (Docs. 33, 34).

53. The Plaintiffs filed a motion for default judgment and attorneys' fees and costs (*Id.*), which this Court granted by order dated September 9, 2019 (Doc. 45), wherein it adopted and approved the Magistrate's Report and Recommendation (Doc. 40).

54. On November 8, 2019, Plaintiffs filed an application for monetary judgment and injunctive relief. (Doc. 50). In support of this application, Plaintiffs also filed the Declaration of John Johnson (Doc. 50-2) and the Affidavit of Blakeley D. Matthews (Doc. 50-3).

55. Plaintiffs have elected to seek statutory damages pursuant to 17. U.S.C. § 504(c)(1). (Docs. 17, 50, 51).

## II. CONCLUSIONS OF LAW

### A. Liability

A default constitutes an admission of all well-pleaded factual allegations in the complaint and the allegations as they pertain to liability are deemed true. *Realsongs, Universal Music Corp., et al. v. 3A North Park Avenue Rest. Corp., et al.*, 749 F. Supp. 2d 81, 85 (E.D.N.Y. 2010) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993)). A default judgment entered on the well-pleaded allegations in the complaint establishes a defendant's liability. *Id.*

JCJP is directly liable to the Plaintiffs for copyright infringement. Liability for direct infringement arises from the violation of any one of the exclusive rights of a copyright owner. *Id.*;

*see also* 17 U.S.C. § 501(a). The owner of copyright has the exclusive rights to and to authorize others to reproduce, distribute, perform publicly, or perform by means of digital audio transmission the copyrighted work. *Id.*; *see also* 17 U.S.C. § 106. Here, the pleadings establish that each of the Plaintiffs to this lawsuit secured the exclusive rights and privileges and to the copyright of certain musical works. The report of the independent investigator establishes that four of these works whose copyrights belong to the Plaintiffs were performed publically at Frisky Frogs, an establishment owned, controlled, managed, operated and/or maintained by JCJP. JCJP never obtained permission or authorization to perform such works. Accordingly, JCJP is a direct infringer.

Defendants Jacob Tucker and Brandon Tucker are both individually and personally liable for copyright infringement through the theory of vicarious infringement. "[A]ny individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity, is personally liable for that infringement." *Realsongs*, 749 F. Supp. 2d at 86. Defendants Jacob Tucker and Brandon Tucker had the right and ability to supervise and control the activities, including the right to supervise and control the public performance of music works, at Frisky Frogs, and they derived a direct financial benefit from the public performance of musical works at Frisky Frogs. They are accordingly vicariously liable to the Plaintiffs for the copyright infringement that took place at Frisky Frogs.

**B. Statutory Damages**

Federal law provides for the recovery of damages by a copyright owner whose works have been infringed. 17 U.S.C. § 504. The Copyright Act (17 U.S.C. 504(c)(1)) provides that:

> [T]he copyright owner may elect . . . to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for

> which any two or more infringers are liable jointly and severally, in a sum of not less than $750 or more than $30,000 as the court considers just.

For infringements found to be willful, the Court has the discretion to award damages of up to $150,000.00 per work infringed. 17 U.S.C. § 504(c)(2). Plaintiffs claim that Defendants' infringements were committed willfully and have elected to recover statutory damages.

1. Willfulness

For an infringement to be found willful, it must be done with knowledge that the conduct constitutes infringement. *See Zomba Enters., Inc. v. Panorama Records, Inc.,* 491 F.3d 574, 584 (6th Cir. 2007). Willfulness may be proved by showing that a defendant had actual or constructive knowledge that it was infringing the plaintiff's copyright, or by showing that the defendant acted in reckless disregard of the high probability that it was infringing plaintiff's copyright. *See Tenn. Walking Horse Breeders' and Exhibitors' Ass'n v. Nat'l Walking Horse Ass'n*, 528 F. Supp.2d 772, 780 (M.D. Tenn. 2007).

The Court finds that Defendants' infringement of Plaintiffs' copyrights in this case was willful. Defendants failed to respond to—and at times actively dodged—over eighty attempts made by ASCAP to contact Defendants, their representatives, agents, or employees, in an effort to remind them of their obligations under federal copyright law and to warn them that unauthorized performances would constitute copyright infringement. Significantly, from December 2016, when ASCAP first began notifying Defendants of their infringement, until December 2018, when Frisky Frogs is believed to have ceased operations, Defendants brazenly continued to feature public performances of copyrighted music at Frisky Frogs, including the works involved in this lawsuit. Even after the initiation of this lawsuit, Defendants still refused to obtain an ASCAP license and engaged in dilatory tactics, *inter alia*: (i) failing to cooperate with discovery (ii) failing to cooperate

with their own counsel, which ultimately led the Court to grant their counsel's motion to withdraw; and (iii) failing to comply with scheduling and other orders. Indeed, around the same time that Frisky Frogs ceased operations, Defendants demonstrated a complete refusal to participate in this litigation. The Court may infer that Defendant willfully infringed Plaintiffs' copyrights because of Defendants' default and failure to obey Court Orders in this action. *Arista Records, Inc. v. Beker Enterprises, Inc.*, 298 F. Supp. 2d 1310, 1313 (S.D. Fla. 2003). Defendants demonstrated a complete and reckless disregard for the high probability that their conduct was infringing on Plaintiffs' rights. Their conduct both prior to and after the commencement of this lawsuit is a glaring example of willful infringement.

2. Amount of Statutory Damages Awarded

The Copyright Act affords the trial court wide discretion in setting the amount of statutory damages. *See*, e.g., *Zomba Enters.,* 491 F.3d at 586-87. Many factors influence an award of statutory damages for copyright infringement, including the expenses saved and the profits earned by the defendant, the revenues lost by the plaintiff, the deterrent effect, if any, that such an award will have on the defendant and on third parties, the cooperation of the defendant in providing evidence concerning the value of the infringing material, the defendant's state of mind, and the conduct and attitudes of the parties. *Peer Int'l,* 909 F.2d at 1336.

In cases involving unlicensed public performances of copyrighted music, such as the case at bar, "courts have held that, in order to put such infringers on notice that it costs less to obey the copyright laws than to violate them, a statutory damage award should significantly exceed the amount of unpaid license fees." *Broadcast Music, Inc. v. R Bar of Manhattan, Inc.,* 919 F. Supp. 656, 659-660 (S.D.N.Y. 1996) (emphasis added) (internal quotations and citations omitted). In other words, statutory damages are designed not solely to compensate the copyright owner for

losses incurred, but also to deter future infringement. *Johnson v. Jones*, 149 F.3d 494, 504 (6th Cir. 1998).

Here, as set forth above, the Court has found that Defendants' infringing conduct was clearly willful. The Plaintiffs have requested an award of $10,000 per infringement for a total award of $40,000, which is well within the range of statutory damages allowed under 17 U.S.C. § 504(c)(1). In light of the foregoing, the Court finds that Plaintiffs are entitled to an award of $10,000 for each of the four compositions, or a total of $40,000 in statutory damages, as a result of Defendants' willful infringement. Further, because the infringement in this case flowed from the joint willful conduct of all of the Defendants, their liability for the awarded damages shall be joint and several. *See Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d. 1110, 1116 (2d Cir. 1986) (two or more copyright infringers may be held jointly and severally liable for statutory damages where the infringement flowed from joint action of the infringers).

### C. Permanent Injunction

Plaintiffs are also entitled to injunctive relief prohibiting Defendants Jacob Tucker and Brandon Tucker from publicly performing works in the ASCAP repertory in the future without first obtaining proper authorization to do so. A court may issue an injunction on a motion for default provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction. *Realsongs*, 749 F. Supp. 2d at 93. Section 502(a) of the Copyright Act provides:

> Any court having jurisdiction of a civil action arising under this title may…grant temporary and final injunctions on such terms as it may deem reasonable to prevent a restrained infringement of a copyright.

17 U.S.C. § 502(a). Accordingly, the moving party must establish that (1) absent injunctive relief, it will suffer irreparable harm, and (2) actual success on the merits. *Realsongs*, 749 F. Supp. 2d at

93.

In order to make out a *prima facie* case of copyright infringement, "a party must establish ownership of a valid copyright and that the defendant violated an exclusive right conferred by the ownership." *Id.* In the case at bar, the Plaintiffs are the copyright owners to the musical works at issue and have established by proof that Defendants used the copyrighted musical works without the proper permission or authority to do so on February 3, 2018. Accordingly, Plaintiffs have established actual success on the merits.

Irreparable harm is presumed where a party has established a *prima facie* case of copyright infringement. *Id.* Moreover, it is clear from the record that Defendants have no intention of following the law and will likely continue to violate Plaintiffs' copyrights absent an injunction. This is exacerbated by the Defendants' conduct throughout this litigation – most significantly being their ultimate complete refusal to participate in this action after Frisky Frogs ceased operations.

### III. CONCLUSION

The Court awards Plaintiffs statutory damages in the amount of $40,000 for Defendants' willful infringement of Plaintiffs' copyrights and permanently enjoins Defendants from performing any songs in the ASCAP repertory in the future without first obtaining proper authorization to do so. The Court also awards Plaintiffs all attorneys' fees and costs, pursuant to 17 U.S.C. § 505. A separate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE